Slip Op. 18-178

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ICCS USA CORPORATION, | |
| Plaintiff, | Before: Mark A. Barnett, Judge |
| v. | Court No. 17-00108 |
| THE UNITED STATES, | **PUBLIC VERSION** |
| Defendant. | |

## <u>OPINION</u>

[Granting Defendant's motion for summary judgment; denying Plaintiff's cross-motion for summary judgment.]

Dated: December 26, 2018

<u>Elon A. Pollack</u> and <u>Matthew R. Leviton</u>, Stein Shostak Pollack & O'Hara, of Los Angeles, CA, for Plaintiff.

<u>Jamie L. Shookman</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant.  With him on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, and <u>Amy M. Rubin</u>, Assistant Director. Of counsel on the brief was <u>Yelena Slepak</u>, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Barnett, Judge:  Before the court are cross motions for summary judgment.

Confidential Def.'s Mot. for Summ. J., and Mem. in Supp. of Def.'s Mot. for Summ. J.

("Def.'s MSJ"), ECF No. 26;[1] Pl.'s Cross-Mot. for Summ. J., and Resp. to Def.'s Mot. for

Summ. J. ("Pl.'s XMSJ"), ECF No. 46-2.  Plaintiff ICCS USA Corporation ("Plaintiff" or

"ICCS") contests the denial of a protest challenging U.S. Customs and Border

Protection's ("Customs" or "CBP") decision to issue a Notice to Redeliver (referred to as

---

[1] The court references confidential memoranda and exhibits, unless stated otherwise.

the "redelivery notice") for the goods in the subject entry,[2] which notice was premised

on Customs' determination that the goods—individual butane gas canisters—contained

a counterfeit certification mark in violation of 19 U.S.C § 1526(e).[3]  *See* Compl. ¶ 3,

ECF No. 7; Pl.'s XMSJ at 1, 4; Pl.'s Reply to Def.'s Opp'n to Pl.'s Cross-Mot. for Summ.

J. ("Pl.'s Reply") at 1-3, ECF No. 54.  The United States ("Defendant" or "the

Government") contends that Customs correctly issued the redelivery notice because the

goods displayed a counterfeit certification mark.  *See generally* Def.'s MSJ.  Plaintiff

asserts that Customs improperly issued the redelivery notice because Plaintiff had

authorization to display the mark.  *See generally* Pl.'s XMSJ; Pl.'s Reply.  For the

reasons discussed below, Defendant's motion for summary judgment will be granted;

Plaintiff's cross-motion for summary judgment will be denied.

---

[2] This action involves a single entry of butane gas canisters.  Def.'s Statement of Undisputed Material Facts ("DSOF") ¶¶ 1-2, ECF No. 19-1; Pl.'s Statement in Resp. to Def.'s Statement of Undisputed Material Facts ("Pl.'s Resp. to DSOF") ¶¶ 1-2, ECF No. 46-1. The entry at issue is M42-1293732-8.  Summons, ECF No. 1.  ICCS contests the denial of protest number 4601-17-102119.  *Id.*

[3] Section 1526(e) incorporates by reference the Lanham Act's definition of counterfeit mark and states:

> [a]ny such merchandise bearing a counterfeit mark (within the meaning of [15 U.S.C. § 1127]) imported into the United States in violation of the provisions of [15 U.S.C. § 1124], shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws.

19 U.S.C. § 1526(e).  The Lanham Act defines "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.   "The term 'mark' includes any trademark, service mark, collective mark, or certification mark."  *Id.*

## BACKGROUND

### 1.    Material Facts Not Genuinely in Dispute

The party moving for summary judgment must show "there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."

United States Court of International Trade ("USCIT") Rule 56(a).  Parties filed cross

motions for summary judgment and submitted separate statements of undisputed

material facts with their respective motions and responses to the opposing party's

statements.  *See* DSOF; Pl.'s Resp. to DSOF; Pl.'s Statement of Undisputed Facts

("PSOF"), ECF No. 46-3; Confidential Def.'s Resp. to Pl.'s Rule 56.3 Statement of

Material Facts to Which There is no Genuine Dispute ("Def.'s Resp. to PSOF"), ECF

No. 49-1.  Upon review of the parties' facts (and supporting exhibits), the court finds the

following undisputed and material facts.[4]

ICCS is a corporation with a principal place of business in Los Angeles,

California.  Compl. ¶ 1; Answer ¶ 1, ECF No. 14.  On January 19, 2017, ICCS imported

56,616 individual butane gas canisters that displayed a "PREMIUM" brand label.  DSOF

¶¶ 2-3; Pl.'s Resp. to DSOF ¶¶ 2-3; PSOF ¶¶ 6–7; Def.'s Resp. to PSOF ¶¶ 6–7.  The

PREMIUM label was affixed on the outside of the butane gas canisters.  PSOF ¶ 8;

Def.'s Resp. to PSOF ¶ 8.  At the time of importation, the canisters displayed a

---

[4] For purposes of this discussion, citations are provided to the relevant paragraph
number of the undisputed facts and response, and internal citations generally have
been omitted. Citations to the record are provided when a fact is admitted based on lack
of knowledge, or to the extent the fact is supported by the proponent's cited documents.
Citations to the record are also provided when a fact, though not admitted by both
Parties, is uncontroverted by record evidence.

registered certification mark owned by Underwriters Laboratory ("UL").[5]  DSOF ¶ 2; Pl.'s

Resp. to DSOF ¶ 2.  The certification mark consists of "UL" in a circle.  *See* Def.'s Ex. 1,

ECF No. 19-2 (photographs of the of the subject goods); Confidential Def.'s Ex. 10 at 1,

ECF No. 26-1.

One Jung Can Mtf. Co. Ltd. ("OJC") manufactured the subject butane gas

canisters.  PSOF ¶ 2; Def.'s Resp. to PSOF ¶ 2.  In October 2001, UL tested OJC's

"MEGA-1" model of butane gas canisters and authorized OJC to display UL's

certification mark on them.  PSOF ¶ 3; Def.'s Resp. to PSOF ¶ 3; Confidential Pl.'s Ex. 2

at UL000069-72 (Report by UL issued on October 2001), ECF No. 47.  As of February

2017, OJC had maintained authorization to display UL's certification mark on its MEGA-

1 model of butane gas canisters.  PSOF ¶ 4; Def.'s Resp. to PSOF ¶ 4; *see also*

Confidential Pl.'s Ex. 7 (Letter from Katie Kim, Customer Relationship Management, UL

Korea Inc., to Kevin Yoo, ICCS, regarding status of multiple listing relationship between

OJC and ICCS, accompanying Pl.'s Protest) ("Kim Letter"), ECF No. 47.

In October 2015, UL issued to ICCS a "Quotation" for "multiple listing services."

*See* Pl.'s Ex. 12 at UL000007-08, ECF No. 59.  A multiple listing allows products

certified by one company (referred to as the "basic applicant," which in this case is OJC)

---

[5] UL "is a testing laboratory that examines and tests various products for compliance with safety standards."  *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1328-29 (Fed. Cir. 2006).  When UL determines that a manufacturer's products comply with applicable standards and requirements, it authorizes the manufacturer to affix UL's certification marks.  *See* Def.'s Ex. 9 at 1, ECF No. 19-2; Pl.'s Ex. 4 (Multiple Listing, Recognition, Verification, and Classification Services Service Terms) ("Service Terms") ¶ 1, ECF No. 59; *see also Acadia Tech.,* 458 F.3d at 1329.

to be produced for marketing under the name of another company (referred to as the "multiple listee," which in this case is ICCS).   Service Terms ¶ 1; Kim Letter.   The Quotation incorporated by reference a Global Services Agreement ("GSA") and the Service Terms.   Pl.'s Ex. 12 at UL000008; *see generally* Service Terms; Pl.'s Ex. 13 (GSA), ECF No. 59.[6]   ICCS signed the Quotation on October 7, 2015.   *See* Pl.'s Ex. 12 at UL000009.   The acceptance of the written Quotation established a Multiple Listing Services Agreement (otherwise referred to as "contract") between multiple listee ICCS and UL.   *See* GSA ¶¶ 1-2.   The Service Terms[7] and the GSA form the contract between ICCS and UL.   *Id.* ¶ 2.

UL maintains an Online Certifications Directory (otherwise referred to as "online directory"), which allows the public to "Verify a UL Listing, Classification, or Recognition."   Def.'s MSJ at 3 n.4; Pl.'s XMSJ at 6; *see also* Confidential Pl.'s Ex. 9, ECF No. 47.   The information that appears on UL's online directory is identical to the information that appears on a "Multiple Listing Correlation Sheet," which is an internal document within UL that is shared with UL's clients.   Confidential Pl.'s Ex. 9; *see generally* Confidential Pl.'s Ex. 6 at UL000187 (Multiple Listing Correlation Sheet), ECF No. 47.   Before February 8, 2017 (including on the date of entry), UL's Online Certification Directory listed only one model of butane gas canister under ICCS's name:

---

[6] The Service Terms refer to "Client" which, according to the GSA, refers to ICCS.   *See* Service Terms at UL000015; GSA at UL000019.
[7] The Service Terms incorporate by reference a Dual Authorization Form, which is also part of the contract.   *See* Service Terms ¶ 5(b); Confidential Pl.'s Ex. 14, ECF No. 47 (Dual Authorization Form).

"US BUTANE."  Def.'s Ex. 2, ECF No. 19-2 (screenshot of UL's Online Certifications

Directory).  On February 8, 2017 (after the date of entry), UL updated both the Multiple

Listing Correlation Sheet and its online directory to include additional models, including

the PREMIUM model, of butane gas canister for ICCS.  *See* Def.'s Ex. 3, ECF No. 19-2

(screenshot of UL's Online Certifications Directory); Confidential Pl.'s Exhibit 6 at

UL000187 (Multiple Listing Correlation Sheet, revised on Feb. 8, 2017).

At the time of importation, CBP placed a manifest hold on the merchandise,

which suspended its release from CBP's custody.  DSOF ¶ 4; Pl.'s Resp. to DSOF ¶ 4.

On January 30, 2017, CBP removed the manifest hold and released the merchandise

from its custody.  DSOF ¶ 4; Pl.'s Resp. to DSOF ¶ 4.  On February 23, 2017, CBP

issued ICCS the redelivery notice, stating that ICCS was in violation of 19 U.S.C

§ 1526(e).  DSOF ¶ 8; Pl.'s Resp. to DSOF ¶ 8.  ICCS redelivered to CBP 29,008 of the

56,616 canisters, which CBP seized on April 19, 2017.  DSOF ¶¶ 9–10; Pl.'s Resp. to

DSOF ¶¶9–10; *see also* PSOF ¶¶ 13–14; Def.'s Resp. to PSOF ¶¶ 13–14.

On May 1, 2017, CBP informed ICCS that the seized merchandise was subject to

forfeiture pursuant to 19 U.S.C. § 1526(e) and provided notice of the seizure to UL.

DSOF ¶10; Pl.'s Resp. to DSOF ¶ 10.  On July 13, 2017, CBP issued ICCS a Notice of

Penalty or Liquidated Damages Incurred and Demand for Payment with respect to the

27,608 canisters that ICCS did not redeliver.  DSOF ¶ 11; Pl.'s Resp. to DSOF ¶ 11;

*see also* PSOF ¶15; Def.'s Resp. to PSOF ¶ 15.  CBP assessed damages against ICCS

in the amount of $41,412.00.  DSOF ¶11; Pl.'s Resp. to DSOF ¶ 11; *see also* PSOF

¶15; Def.'s Resp. to PSOF ¶ 15.

ICCS filed a protest against CBP's demand for redelivery on April 6, 2017.

DSOF ¶12; Pl.'s Resp. to DSOF ¶ 12; *see also* PSOF ¶ 16; Def.'s Resp. to PSOF ¶ 16.

In its protest, ICCS claimed that the redelivery notice was unlawful because ICCS had a

multiple listing relationship with UL and, therefore, had UL's authorization to import the

goods bearing the mark.  Confidential Pl.'s Ex. 7.  ICCS provided Customs with the

Multiple Listing Correlation Sheet, which had been revised on February 8, 2017 to

include the PREMIUM model.  *Id.*

ICCS's protest was deemed denied on May 8, 2017.[8]  Def.'s Ex. 11, ECF No. 19-

2.  CBP did not review ICCS's contract terms with UL when it analyzed the certification

mark on the goods.  Pl.'s SOF ¶ 17; Def.'s Resp. to Pl.'s SOF ¶ 17.  On May 26, 2017,

UL asserted its position to CBP that its certification marks "are not retroactive."

Confidential Pl.'s Ex. 8 at CBP000002, ECF No. 47.

### 2.    Procedural History

Plaintiff filed this action on May 11, 2017.  *See* Summons.  Plaintiff's complaint

alleges that Customs issued an improper redelivery notice because both ICCS and OJC

had valid license agreements with UL to display UL's certification mark.  Compl. ¶ 10.

The Government filed its answer on November 9, 2017 and, shortly thereafter, filed a

motion for summary judgment.  *See* Answer; Def.'s MSJ .  With permission from the

---

[8] Defendant avers that CBP denied the protest on May 26, 2017, citing Defendant's
Exhibit 11.  DSOF ¶ 12; Pl.'s Resp. to ¶ 12.  While Exhibit 11 includes May 26, 2017 as
the date of denial, it cites 19 U.S.C. § 1499(c)(5)(B) and 19 C.F.R. § 174.21(b) as the
basis for the denial.  Those provisions state that protests relating to exclusions are
treated as denied after 30 days.  Consequently, the effective date of denial is May 8,
2017.

court, Plaintiff conducted limited discovery, after which it filed its response and cross-

motion for summary judgment.  *See* Order (Jan. 12, 2018), ECF No. 32; Pl.'s XMSJ.

### JURISDICTION

The single entry at issue consisted of 56,616 butane gas canisters, 29,008 of

which the Government seized on April 19, 2017.  DSOF ¶¶ 1-2, 9–10; Pl.'s Resp. to

DSOF ¶¶ 1-2, 9–10.  Plaintiff's complaint alleges that the court has subject matter

jurisdiction over this action pursuant to 28 U.S.C. § 1581(a)[9] and the parties appear to

agree that this action only concerns the 27,608 butane gas canisters that Customs did

not seize.[10]  *See* Def.'s MSJ at 4-5; Pl.'s Reply at 6, 13.  It is undisputed that Customs

seized 29,008 butane gas canisters and provided notice of that seizure to ICCS prior to

Plaintiff's commencement of this lawsuit.  DSOF ¶¶ 9–10; Pl.'s Resp. to DSOF ¶¶ 9–10.

Pursuant to 28 U.S.C. § 1356, the court's jurisdiction does not extend to the 29,008

seized butane gas canisters.

Sections 514 and 515 of the Tariff Act of 1930 set forth the mechanism for

protesting Customs' redelivery decisions.  *See* 19 U.S.C. §§ 1514, 1515.  The Court of

International Trade has "exclusive jurisdiction of any civil action commenced to contest

the denial of a protest, in whole or in part, under [19 U.S.C. § 1515]."  28 U.S.C.

§ 1581(a).  This includes a challenge to the denial of a protest concerning "a demand

---

[9] Plaintiff's jurisdiction allegation is uncontroverted.  See Compl. ¶ 3; Answer ¶ 3.
[10] "It is well established" that the Court of International Trade "lacks jurisdiction under § 1581(a) to review a seizure of goods by Customs."  *H & H Wholesale Servs., Inc. v. United States*, 30 CIT 689, 692, 437 F. Supp. 2d 1335, 1340 (2006).  Pursuant to 28 U.S.C. § 1356, jurisdiction over seized merchandise lies with the district court.

for redelivery [of merchandise] to customs custody under any provision of the customs laws."[11]  19 U.S.C. § 1514(a)(4); *see also Xerox Corp. v. United States*, 423 F.3d 1356, 1365 (Fed. Cir. 2005) ("[T]he existence of a protestable decision of the type enumerated in 19 U.S.C. § 1514(a) is a condition precedent for jurisdiction to lie in the Court of International Trade under section 1581(a).").  Because Plaintiff availed itself of the remedies in 19 U.S.C. §§ 1514 and 1515 in challenging the redelivery of the butane gas canisters that Customs did not seize, the court has jurisdiction over the challenge to the denial of its protest.  *See* 28 U.S.C. § 1581(a).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT Rule 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court must view the evidence in the light most favorable to the nonmovant and may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986); *Netscape Comm.'s Corp. v. Konrad*, 295 F.3d at 1315, 1319 (Fed. Cir. 2002).  When both parties move for summary judgment, the court generally must evaluate each party's motion on its own merits and draw all reasonable inferences against the party whose motion is under consideration.  *JVC Co. of Am., Div. of US JVC Corp. v. United States*, 234 F.3d 1348, 1351 (Fed. Cir. 2000).

---

[11] An exception exists for determinations appealable under 19 U.S.C. § 1337, which is not relevant here.  *See* 19 U.S.C. §§ 1337, 1514(a)(4).

### STANDARD OF REVIEW

The court reviews denial of protest claims arising under 19 U.S.C. § 1515 *de novo*, and "make[s] its determinations upon the basis of the record made before [it]."  28 U.S.C. § 2640(a)(1).

Defendant asks the court not to review the terms of the Multiple Listing Services Agreement between ICCS and UL, contending that the court "need not and should not decide substantive issues of trademark law [to] determine whether CBP properly denied [this] protest" because the proper forum to decide those issues is in district court.  *See* Mem. of Law in Opp'n to Pl.'s Cross-Mot. for Summ. J. and in Further Supp. of Def.'s Mot. for Summ. J. ("Def.'s Resp.") at 1-6, ECF No. 49.  In essence, the Government asks the court only to determine whether Customs procedurally complied with its regulations when making its demand for redelivery.  *See id*. at 4-5 (the court's inquiry is limited to determining whether "evidence supports a finding that CBP had a valid reason to suspect that UL's mark was being infringed") (citing 19 C.F.R. §§ 133.21(b)(1), 133.26, 141.113(d)).

Plaintiff maintains that the court is not limited to procedural questions but must reach the substantive legal issues underlying the redelivery notice to determine whether CBP properly denied ICCS's protest.  Pl.'s Reply at 3-10.  Plaintiff argues that the court must analyze the terms of the Multiple Listing Services Agreement to determine whether ICCS had authorization to display UL's certification mark on the goods at issue and, thus, whether Customs' decision to deny the protest was proper.  Pl.'s XMSJ at 2.

Each of the Court of International Trade cases declining jurisdiction upon which the Government relies are inapposite because they concerned seized merchandise and, thus, jurisdiction was proper in district court.  *See* Def.'s Resp. at 5 (citing *Int'l Maven, Inc. v. McCauley,* 12 CIT 55, 58-59, 678 F. Supp. 300, 303 (1988); *H & H Wholesale Servs.,* 30 CIT at 701, 437 F. Supp. 2d at 1348; *Tempco Mktg. v. United States,* 21 CIT 191, 193, 957 F. Supp. 1276, 1279 (1997); *Genii Trading Co. v. United States,* 21 CIT 195, 197 (1997); *CDCOM (U.S.A.) Int'l, Inc. v. United States*, 21 CIT 435, 439, 963 F. Supp. 1214, 1218 (1997)).  As noted, this action concerns only the canisters that CBP did not seize.

CBP issued the redelivery notice on the basis that the merchandise contained a counterfeit certification mark, in violation of 19 U.S.C. § 1526(e).  Generally, Customs' decisions "including the legality of all orders and findings entering into the same, as to . . . a demand for redelivery" are "final and conclusive . . . unless a protest is filed" or "a civil action contesting the denial of a protest" is commenced in this court.  19 U.S.C. § 1514(a)(4).  As explained above, Plaintiff availed itself of the protest remedy, commenced this action challenging the denial of that protest, and this court has jurisdiction to review the denial of the protest.  *See* 28 U.S.C. § 1581(a).

Here, the question of whether CBP properly denied ICCS's protest turns on whether the goods at the time of importation displayed a counterfeit certification mark. That the underlying substantive issue could also fall within the jurisdiction of a district court (in another type of case) does not preclude this court from reaching the issue in this case.  *See CBB Grp., Inc. v. United States*, 35 CIT __, 783 F. Supp. 2d 1248, 1250-

51, 1256 (2011) (addressing the court's ability to reach an issue of copyright law); *cf.*

*Lois Jeans & Jackets, U.S.A., Inc. v. United States*, 5 CIT 238, 241, 244, 566 F. Supp.

1523, 1528 (1983) (declining to reach an issue of trademark law that was then before a

district court while asserting jurisdiction over the protest claim).

Here, the court has exclusive jurisdiction over Plaintiff's challenge to the denial of

its protest.  *See* 28 U.S.C. § 1581(a).  Moreover, because the determination of whether

the notice of redelivery was proper and whether the merchandise displayed a

counterfeit UL certification mark are the same, the court may reach the underlying

issues associated with ICCS's use of the certification mark pursuant to the *de novo*

standard of review.[12]

## LEGAL FRAMEWORK

Generally, when imports that should not have been admitted into the commerce

of the United States have been released, Customs demands the return of such imports

to its custody. *See* 19 C.F.R. §§ 133.26,[13] 141.113(d).[14]  In this case, CBP issued the

---

[12] If the court is to determine that the denial of ICCS's protest was proper because ICCS displayed a counterfeit mark, it necessarily must view all the evidence on the record before it, including the Multiple Listing Service Agreement.  *See* 28 U.S.C. § 2640(a)(1).

[13] "If it is determined that merchandise which has been released from CBP custody is subject to the restrictions of § 133.21, § 133.22 or § 133.23 of this subpart, an authorized CBP official shall promptly make demand for the redelivery of the merchandise . . . ."  19 C.F.R. § 133.26

[14] 19 C.F.R. § 141.113(d) provides:

> If at any time after entry an authorized CBP official finds that any merchandise contained in an importation is not entitled to admission into the commerce of the United States for any reason not enumerated in paragraph (a), (b), or (c) of this section, an authorized CBP official shall promptly demand the return to CBP custody of any such merchandise which has been released.

redelivery notice on the basis that the goods contained a counterfeit certification mark,

in violation of 19 U.S.C. § 1526(e).  In relevant part, 19 U.S.C. § 1526(e) provides that:

> [a]ny [merchandise of foreign manufacture] bearing a counterfeit mark (within the meaning of [15 U.S.C. § 1127]) imported into the United States in violation of the provisions of [15 U.S.C. § 1124[15]], shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws.

19 U.S.C. § 1526(e).[16]  "A 'counterfeit' is a spurious mark which is identical with,

or substantially indistinguishable from, a registered [certification] mark."  15

U.S.C. § 1127; *see also* 19 C.F.R. § 133.21(a) (similar).  A "spurious" mark is

one that "false."  Webster's Third New Int'l Dictionary of the English Language

Unabridged (2002) ("Webster's") at 2212; *see also Computer Towers*, 152 F.

Supp. 2d at 1198.

> The term "certification mark" means any word, name, symbol, or device, or any combination thereof--
> (1) used by a person other than its owner, or
> (2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,

---

[15] Section 1124 forbids any article of imported merchandise that copies or simulates a registered certification mark from entry into the United States.  *See* 15 U.S.C. § 1124; *United States v. 10,510 Packaged Computer Towers, More or Less ("Computer Towers")*, 152 F. Supp. 2d 1189, 1196 (N.D. Cal. 2001) (holding that 15 U.S.C. § 1124 covers certification marks).  "Merchandise bearing a 'counterfeit mark' is [] a subset of merchandise that merely 'copies or simulates' a registered mark. . . . [T]he provisions of sections 1526(e) and 1124, read together, relate only to marks that are 'counterfeit.'" *Sakar Int'l, Inc. v. United States*, 516 F.3d 1340, 1346 n.5 (Fed. Cir. 2008) (internal citations omitted).

[16] As discussed *supra*, the court is not considering the validity of the seizure of merchandise; however, this provision is relevant to the basis for CBP's redelivery notice.

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

15 U.S.C. § 1127.  Counterfeit certification marks, such as those owned by UL,

"falsely imply that the merchandise has been tested and approved for safety."

*Computer Towers*, 152 F. Supp. 2d at 1197.

**DISCUSSION**

1.     **Parties' Contentions**

Defendant avers that it is entitled to summary judgment because, at the time of

entry, ICCS lacked authorization from UL to display UL's certification mark on the

PREMIUM model of butane canisters.  Def.'s MSJ at 8.  Relying on the Online

Certifications Directory, Defendant contends that ICCS had authorization to display UL's

certification mark only on the US BUTANE model of gas containers, and ICCS received

permission to use UL's mark on the PREMIUM model after the date of entry.  *Id.* at 9.

Defendant asserts that UL did not consent to the retroactive use of its certification mark.

Def.'s MSJ at 6-7, 10-11.  Defendant also relies on statements by a UL employee that

UL has a "strict zero-tolerance policy," and a "long-standing non-negotiable position . . .

[to] not consent to the importation, exportation, obliteration, or removal of unauthorized

UL certification marks on products and/or packaging seized by law enforcement for

trademark infringement."  *Id.* at 10-11 (quoting Def.'s Ex. 9 at 2).  This policy, according

to UL, is "uniformly applied and [] considered reasonable and necessary in order to

protect the integrity of [its] registered marks."  Def.'s Ex. 9 at 2.

Plaintiff contends that the Government relies on "extrinsic evidence," which is "not dispositive" of the issue in this case.  Pl.'s XMSJ at 7.  Plaintiff argues that its contract with UL permitted it to affix the certification mark on any brand of butane gas canisters if they were the same physical product as OCJ's MEGA-1 butane gas canister that UL certified in 2001.  *See id.* at 3, 8-9.[17]  Plaintiff admits that UL did not update ICCS's multiple listing to include the PREMIUM model until February 8, 2017, *id.* at 14, but maintains that "[u]pdating the listing is simply a record keeping requirement" and failure to comply with it did not render the goods counterfeit, *id.* at 10.  Plaintiff avers that the PREMIUM brand label "is purely cosmetic," *id.* at 3, and any changes to OJC's MEGA-1 brand product were "superficial and do not violate UL's trademark rights," *id.* at 9.

### 2.    Analysis

"A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered [certification] mark."  15 U.S.C. § 1127.  The parties do not dispute that the mark displayed on the butane gas canisters on the date of entry was identical to the registered certification mark owned by UL.  The only question, therefore, is whether the mark was "spurious."  *See id.*  Plaintiff argues that the mark was not spurious because its contract with UL provided ICCS authorization to display the mark on the PREMIUM model of butane gas canisters.  *See, e.g.*, Pl.'s XMSJ at 19.

---

[17] Elsewhere in its brief, however, Plaintiff argues that "[t]he Service Terms do not address [the] issue" of whether UL "must provide express authorization for each particular brand of butane canister before ICCS may lawfully display the UL certification mark on the product."  Pl.'s XMSJ at 13.

The GSA, which forms part of the contract between ICCS and UL, has a choice

of law provision, providing that Illinois law governs disputes between contracting parties.

GSA ¶ 22.  When a contract is governed by Illinois law, the court's initial task is to

determine whether the contract terms are ambiguous.  *See United States v. 4500*

*Audek Model No. 5601 AM/FM Clock Radios* ("*Audek Model Clock Radios*"), 220 F.3d

539, 542 (7th Cir. 2000).  "Whether a contract is ambiguous is a question of law, and

ambiguity can be found only if the language of the contract is reasonably or fairly

susceptible of more than one construction."  *Id.* at 543 n.6 (internal quotation marks and

citation omitted).  When the contract terms are unambiguous, "the court must decide the

contract's meaning as a matter of law."  *Id.* at 542.

ICCS entered into a contract with UL in October 2015.[18]  Pursuant to this

contract, OJC was the "basic applicant" and ICCS was the "multiple listee."  Kim Letter;

---

[18] The Service Terms detail the steps for the establishment of a multiple listing
relationship.  As it pertains to ICCS, the first step was for the manufacturer (OJC) to
establish a listing relationship with UL with respect to its "basic products,'' which allowed
OJC to affix UL's mark on products marked with OJC's name.  Service Terms ¶ 1; *see
also id.* ¶ 2 (defining "[b]asic products" as "devices, equipment, materials, or systems
submitted" to UL for assessment and determination as to the product's eligibility for UL's
services).  Here, "basic products" refers to ICCS's MEGA-1 model of butane gas
canisters. *See* PSOF ¶ 3; Def.'s Resp. to PSOF ¶ 3 (undisputed fact that UL tested
"MEGA-1" model of butane gas canisters in 2001); Kim Letter (stating [[
                                                                      ]]); Confidential
Pl.'s Ex. 9 at UL0000346 (stating that [[
                                          ]]); Confidential Pl.'s Ex. 6 at
UL000187 (Multiple Listing Correlation Sheet showing [[
                                                        ]]).  The second step required UL to
"publish[] a Listing, Recognition, Verification, or Classification on behalf of [OJC]".
Service Terms ¶ 1.  In the third step, UL authorized OJC to affix UL's certification mark
on the basic product marked with ICCS's label, instead of OJC's label.  *Id.*

*see also* Service Terms ¶ 1.  The Service Terms, which are part of the contract, explain

that the scope of service was to authorize OJC to affix UL's certification mark on the

"basic product" marked with ICCS's label, instead of OJC's label.  Service Terms ¶ 1.

The Service Terms refer to ICCS as "a third-party company whose label is applied to a

[UL] certified product" and "is included in [UL's] Online Certification Directory."  *See id.* ¶

2 (defining "multiple listee").  When ICCS entered into a contract with UL, it registered

only the US BUTANE model.  Kim Letter; Def's Ex. 2 (screenshot of UL's Online

Certifications Directory showing only the US BUTANE model).  As discussed below, the

Service Terms contemplate the addition of other models to ICCS's multiple listing, but

only after approval from UL.

The Service Terms authorize the designation of a "multiple listing manager" to

submit "multiple listing requests" to UL on behalf ICCS.  Service Terms ¶ 4(a).  The

Service Terms define "multiple listing requests" as when OJC and ICCS "[a]dd, [d]elete,

or [r]evise products . . . within an existing [m]ultiple [l]isting [r]elationship."  *Id.* ¶ 2.

When making a multiple listing request, the multiple listing manager must inform UL, in

writing, "of the basic product" and must also "*specify* [ICCS's] company name, the name

of the product(s), and identifying catalog, *model* or other product designations *for which*

*the Service is desired*."[19]  *Id.* ¶ 4(b) (emphasis added).

---

[19] As is evident from this sentence, the first provision requires identifying information
regarding the basic product; the second provision requires identifying information on the
multiple listee's "model . . . for which the Service is desired."  *Id.* ¶ 4(b).

The Service Terms provide guidance on the types of products eligible for a

multiple listing request.  It states that the products "shall not differ from the basic

product(s) other than in color, trim, company identification, product designation, or other

features *that UL . . . deems to be superficial.*"[20]  *Id.* ¶ 6(a) (emphasis added).  When UL

determines that this requirement has been satisfied, it "will *add a Multiple Listing,*

Recognition, Verification, or Classification *Correlation Sheet . . . to authorize [OJC] to*

*use the [certification mark] on the product* and publish the Multiple Listing, Multiple

Recognition, Multiple Verification, or Multiple Classification in such form, manner, and

classification as UL . . . may determine, after [ICCS] executes the GSA."[21]   *Id.* ¶ 7(a)

(emphasis added).  The Service Terms further explain that "[t]he Multiple Listing

Correlation Sheet will identify and set forth requirements for the product and *will specify*

the [certification mark that] may be used *only on* or in connection with the product . . . ."

*Id.* ¶ 7(b) (emphasis added).

The events that took place in this case, albeit with some occurring after the date

of importation, are consistent with the steps outlined in the Service Terms.  In October

2015, ICCS designated Kevin Yoo as its authorized multiple listing manager.  *See*

---

[20] Plaintiff claims this clause gave ICCS authorization to display the mark on any brand of the basic products if the branding is deemed superficial.  Pl.'s XMSJ at 9.  However, the provision provides that UL determines whether the branding is superficial, not ICCS. *See* Service Terms ¶ 6(a).
[21] Plaintiff claims that this clause applies only to OJC and is silent on ICCS's authorization to use the mark.  Pl.'s XMSJ at 12-13.  Plaintiff's interpretation is inconsistent with paragraph 1 of the Service Terms, which provides that the multiple listing service authorizes OJC to affix UL's certification mark on the basic product marked with ICCS's label, instead of OJC's label.  *See* Service Terms ¶ 1.

Confidential Pl.'s Ex. 14 at UL000024-25; *see also* Service Terms ¶ 5(b) (incorporating

by reference the Dual Authorization Form).  Only after ICCS imported the goods in

question did Mr. Yoo submit a multiple listing request to UL and include the PREMIUM

model in the request.  *See* Confidential Pl.'s Ex. 6 at UL000109.  On February 8, 2017,

UL updated its Multiple Listing Correlation Sheet to include the PREMIUM model.[22]  *Id.*

at UL000187.

      Contrary to Plaintiff's assertion that "[t]he Service Terms do not address [the]

issue" of whether UL "must provide express authorization for each particular brand of

butane canister before ICCS may lawfully display the UL certification mark on the

product," Pl.'s XMSJ at 13, the Service Terms, as discussed above, clearly do address

the issue.  UL only adds a new model to the Multiple Listing Correlation Sheet after

ICCS submits a multiple listing <u>request</u> and <u>UL determines</u> that the model is eligible for

a multiple listing service because any differences in the new model's features are

superficial from the basic (MEGA-1) product.  Here, UL did not update the Multiple

Listing Correlation sheet until after the date of importation.  Both the Service Terms and

the GSA expressly forbid ICCS from using UL's certification marks "on any goods or

their containers or packaging," "[e]xcept as otherwise expressly authorized."  Service

Terms ¶ 8; *see also* GSA ¶ 8 (similar).  Because ICCS did not have express

authorization to display UL's certification mark on the PREMIUM model on the date of

---

[22] On February 10, 2017, UL issued a Certificate of Compliance stating that
[[                                                                              ]].
Confidential Pl.'s Ex. 6 at UL000114.

importation, and because UL's authorization that occurred after the date of importation

was not retroactive, the certification mark was spurious and, therefore, counterfeit.[23]  *Cf.*

*Audek Model Clock Radios*, 220 F.3d at 534-44 (interpreting a contract under Illinois law

and holding that manufacturer of clock radios did not have authorization to affix UL's

certification mark on the radios imported from China when the agreement only listed a

location in Chicago, Illinois); *Computer Towers*, 152 F. Supp. 2d at 1198-99 (holding

that a mark was spurious when "its placement on the packages and boxes [of a

computer tower] falsely suggest[ed] that [UL had] inspected and certified the entire

computer tower" but UL had certified only "the power supply *housed within* the computer

tower").

Plaintiff avers that the PREMIUM brand label "is purely cosmetic" and only "for

marketing purposes."  Pl.'s XMSJ at 3 (citing Confidential Pl.'s Ex. 5, ECF No. 47); PSOF

¶ 8 (citing Confidential Pl.'s Ex. 5; Def.'s Ex. 1).  First, the cited exhibits are photographs

depicting the PREMIUM model butane gas canisters.  These photographs do not

establish that the label is purely cosmetic or only for marketing purposes.  Second, as

stated above, the contract does not give ICCS authorization to display the certification

mark on any model that ICCS deems "cosmetic"; rather, ICCS must request the addition

of new models to the multiple listing service by submitting a Multiple Listing Request

---

[23] Indeed, UL's final determination on its Mark Verification Report is consistent with this conclusion.  Confidential Def.'s Ex. 10 at 2 (concluding that the BUTANE model goods at issue were "[[                                                                      ]]).

Form.  UL will add the product to the service "[i]f the product(s) is found to be eligible . . . ."  Service Terms ¶ 7(a).

Plaintiff also avers that UL deemed the PREMIUM label as "superficial," which means that ICCS did not violate its contract with UL.  PSOF ¶ 10; Pl.'s Reply at 9.  While it can be inferred that UL deemed any differences between the US BUTANE and PREMIUM models to be "superficial" on February 8, 2018, UL did not make that judgment prior to the importation date and nothing authorized ICCS to display the mark on the date of importation without UL's authorization.  *See* Service Terms ¶ 8; GSA ¶ 8.  Therefore, Plaintiff's superficiality argument must fail.  To the extent that Plaintiff's briefs may be read to suggest that Plaintiff is making distinct, additional arguments, the court finds them inapposite to the issue before it.

### CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted; Plaintiff's cross-motion for summary judgment is denied.  Judgment will be entered accordingly.


                                                    /s/      Mark A. Barnett____
                                                    Mark A. Barnett, Judge

Dated:   December 26, 2018_____
            New York, New York